IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JONATHAN SCHWENKE                                                 PLAINTIFF

v.                     Civil No. 15-5303

DEPUTY JACOB CIFUENTES                                  DEFENDANT

## **REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

This is a civil rights action filed by the Plaintiff pursuant to 42 U.S.C. § 1983. Plaintiff contends the Defendant violated his federal constitutional rights by using excessive force against him while he was detained at the Washington County Detention Center (WCDC) in Fayetteville, Arkansas.

Defendant filed a motion for summary judgment (Doc. 18). Plaintiff filed a response (Doc. 22).[1] The motion is ready for decision.

### **1. Background**

Plaintiff was booked into the WCDC on August 1, 2015. *Defendant's Exhibit* (hereinafter *Deft's Ex.*) A-1 at 6. He remained incarcerated there until his transfer to the Arkansas Department of Correction on February 8, 2016. *Deft's Ex.* B at 13. At the time of the incident at issue in this case, October 17, 2015, Plaintiff was in pretrial status. *Id.*; *see also Deft's Ex.* A-1 at 2.

---

[1] In Plaintiff's response, Plaintiff indicated that he did not oppose dismissal of his claims against Sheriff Helder and John or Jane Doe Medical Staff (Doc. 22 at pg. 7). These Defendants were, therefore, dismissed from this aciton. (Docs. 24, 25).

AO72A
(Rev. 8/82)

Defendant was hired by the Washington County Sheriff's Office as a jail deputy on October 12, 2015. *Deft's Ex.* A at ¶ 2. He was given a copy of department policies on that date. *Id.* He completed the detention training program in January 2016 and the jail standards course in February 2016. *Id.*

On October 17, 2015, Defendant was performing jail checks when he noticed some inmates had fashioned cloth and plastic into strings and rope that were hung on the bunks. *Deft's Ex.* A-2 at 3. Defendant considered these to be contraband because "they were being used for an unauthorized purpose." *Id.*

According to Plaintiff, he had a cup tied to a string off a shirt hanging from the post of his bunk. *Deft's Ex.* B at 19 & 28. Plaintiff kept various items in the cup including kool-aid, packs of coffee, and erasers. *Id.* at 19. Defendant took the cup down and confiscated the cloth string. *Id.* at 19 & 28. Defendant then moved on to the next area of the upper tier. *Id.* at 19; *Deft's Ex.* A-6.

Plaintiff tied the cup back up using a rope he had fashioned out of plastic candy wrappers. *Deft's Ex.* B at 19 & 28. Defendant took the cup down and told Plaintiff not to put it back up again. *Id.* at 19. Plaintiff states none of the other officers had taken the cups down and "everybody" had "them up there." *Id.*

Plaintiff put a sock in his hand and "acted like" or "insinuated" that he was going to tie the cup up a third time using his sock. *Deft's Ex.* B at 28. Plaintiff testified he was not going to tie the cup up again but was just "giving [Defendant] a hard time . . . [b]ecause he gives everybody else a hard time" *Id.* at 50.

-2-

Plaintiff testified that Defendant went downstairs and came back up with Deputy Carter. *Deft's Ex.* B at 19. Defendant told Plaintiff to give him the sock and cup. *Id.* at 19 & 55. Plaintiff refused to give Defendant either item and threw the sock on the floor. *Id.* at 55. Defendant asked for the cup again and Plaintiff refused. *Id.* Plaintiff testified he probably used some cuss words but not to the extent stated in Defendant's incident report. *Id.* at 50; *see Deft's Ex.* A-2 at 3-4 (Defendant's incident report).

Plaintiff agreed that an order from a deputy should be followed. *Deft's Ex.* B at 77. If he thought the deputy was wrong, it would typically be addressed through a grievance. *Id.* In this instance, Plaintiff felt the cup was his and the Defendant was "stealing" from him. *Id.* In his mind, a written grievance "would have done no good." *Id.*

Plaintiff testified that at this point, Defendant "yanked" him off the bunk. *Deft's Ex.* B at 19. Plaintiff stated Defendant had not given him any command to stand up, put his hands behind his back, or to come outside. *Id.* Plaintiff continued to describe the incident as follows:

> So, by that point, of course, he said stop resisting. I'm trying to tell him I'm not resisting, get off me and I'll give you my hand. Carter, Deputy Carter has my other hand, and he's like saying something to Cifuentes, I don't know what it was. I was just concentrating on trying to get my hand out from under me, but I got this big dude on me. So, finally, I feel the pressure off me, so I go to put this arm behind my back, when I'm doing this, here comes a knee off the back of my head, and my face hits the ground. . . . [H]e jumped on my head and bounced my face off the concrete. I wasn't resisting at the time. I was trying to give him my hand.

*Id.* at 19-20. Plaintiff testified he never touched the Defendant; did not roll around other than trying to get his hand out from under him; and did not push with his legs. *Id.* at 56-57.

AO72A
(Rev. 8/82)

Plaintiff later testified that he heard Deputy Carter telling Defendant "that's enough, that's enough." *Deft's Ex.* B at 25. Plaintiff states the Defendant "was enraged . . . over something [the cup] that he can't have because I bought it." *Id.* at 49.

After this, handcuffs were put on Plaintiff and he laid there on the floor for a short time. *Deft's Ex.* B at 20. During that time, Plaintiff asked Defendant to slide a book under his head and Defendant did so. *Id.* Plaintiff testified Deputy Carter picked him up and took him to the hall. *Id.* Plaintiff testified that when he was going down the stairs he started blacking out and continued to do so once he was in the hallway. *Id.* at 58. He testified he blacked out "[a] lot of times . . . but they kept waking me up before I went all the way out." *Id.*

Plaintiff was not given a disciplinary as a result of this incident. *Deft's Ex.* B at 61. Plaintiff testified that on every other occasion when he was accused of failing to follow orders he was given a disciplinary. *Id.* at 79. Following the incident, Plaintiff submitted a number of grievances about the alleged use of excessive force. *Deft's Ex.* A-4.

Plaintiff described his injuries as follows: "I had a softball-sized knot on my forehead, and a baseball one on the back of my head." *Deft's Ex.* B at 30. He testified he had headaches almost every day until January, when they started decreasing. *Id.* He took Ibuprofen for his headaches. *Id.*

He testified his vision was blurred for the first week and "then off and on a little bit." *Deft's Ex.* B at 30. He received no treatment for his blurred vision and has no lingering problems with his vision. *Id.* at 31. He testified he already suffered from depression but the incident "just brought it up -- back up." *Id.* He received no treatment for his depression. *Id.* at 32.

AO72A
(Rev. 8/82)

He also testified he had debilitating anxiety attacks following the incident. *Id.* Specifically, he said the "biggest thing is when someone would stop by with the meal cart, I just start getting freaked out a little bit." *Id.* When this happened, he would just try to "calm myself down." *Id.*

Finally, he testified he had nightmares. *Deft's Ex.* B at 34. He testified: "I dreamed of what was happening -- what happened. I just got beat up by a cop. I mean, yeah." *Id.* He indicated he would have the nightmares "off and on." *Id.* During the first week following the incident, Plaintiff indicated he had insomnia. *Id.*

Plaintiff was seen by the nurse following the incident. The nursing report indicates as follows:

> At approximately 1740-1745 this nurse was called to assess Schwenke, Jonathan in F block, PT, had closed hematoma over the left eye, past the hairline. Pt. was alert and oriented to person, place, time, and situation. Full range of motion to all extremities was noted. Gait steady. Pupils were equal and reactive--3mm/+. Ice was applied to wound. This nurse recommended that pt be put in location that he could be closely monitored for the next 1-2 hours for s/sx related to head injuries.

*Deft's Ex.* A-2 at 1. Plaintiff was taken to an isolation unit and remained there a couple of hours. *Deft's Ex.* B at 60. Plaintiff testified an x-ray was taken of his head but he did not believe it was done until January. *Id.* at 64.

Pictures of the injuries were taken on October 22, 2015. *Deft's Ex.* A-2 at 5. Deputy Rex, in his incident report, states there was a "large contusion on the upper left side" of Plaintiff's forehead. *Id.* There was also a "small bump on the back of his head under the hair" but due to it "not being visible . . . no picture" was taken. *Id.*

AO72A
(Rev. 8/82)

On the first picture, there is a red swollen area beginning at about the half way point on Plaintiff's left eyebrow and extending upwards to the hairline and left to the hairline. *Deft's Ex.* A-5 at 2.[2] There is a small abrasion just left of the mid-point of the swollen area. *Id.* The second picture shows some redness on the skin above Plaintiff's nose. *Id.* at 3. This area, however, does not appear swollen. *Id.* The third picture shows that there is some swelling of his left eyebrow and around his left eye. *Id.* at 4. The fourth picture shows it is black and blue around his left eye. *Id.* at 5. The fifth picture is of the right side of his face and no injuries are visible on this side of his face. *Id.* at 6. The sixth picture shows what appears to be a reddened area in his hair from the mid-ear down to his hair line. *Id.* at 7. The seventh picture shows a red abrasion on Plaintiff's left arm approximately the size of a half-dollar. *Id.* at 8. The eighth picture is of the Plaintiff's chest and no additional injuries can be seen. *Id.* at 9. The final picture is of the Plaintiff's back and no additional injuries can be seen. *Id.* at 10.

Plaintiff testified the deputies were trained to "ask, tell, and make" you do something. *Deft's Ex.* B at 40. Specifically, Plaintiff said it was a progression they would ask him to do something, tell him to do something, and then make him do it. *Id.* at 41.

There is a video of the incident. *Deft's Ex.* A-6. The video contains no audio. *Id.* The video is not the best quality and the upper tier where the Plaintiff is located is dark. *Id.*

At approximately 16:20 on the video, Defendant walks up the stairs to the upper tier of the pod. *Deft's Ex.* A-6. At approximately 18:00, Defendant appears to be untying something from several of the bunks. *Id.* Defendant goes to the Plaintiff's bunk and is removing what is later identified as a cloth string from the bunk. *Id.* At 18:36, Plaintiff comes up the stairs to his

---

[2]The pictures in the CM/ECF database are in color.

bunk. *Id.* He and the Defendant appear to engage in a discussion. *Id.* At 19:20, several other inmates come into the area around Plaintiff's bunk. *Id.* At 19:50, Defendant walks over to the remaining bunks and is looking the area over. *Id.* At 20:40, Defendant walks back to the Plaintiff's bunk and removes what is later described as a plastic string or rope made of candy wrappers. *Id.* At 21:02, Defendant goes down the stairs. *Id.* At 21:51, Defendant and Deputy Carter come upstairs and appear to engage in a discussion with the Plaintiff. *Id.* At 22:30, Defendant suddenly reaches out and pulls the Plaintiff from his bunk. *Id.* Defendant appears to be trying to take the Plaintiff to the floor. *Id.* At this point in the video, Deputy Carter is partially blocking the view of the Defendant and Plaintiff. *Id.* Plaintiff sits up, flails his arms, puts his legs out to the side, and uses his arms in what appears to be an effort to keep from being taken to the floor. *Id.* At 22:44, Deputy Carter kneels and is located to the far right of the screen. *Id.* Deputy Carter appears to be trying to get a hold of one of Plaintiff's arms. *Id.* At this point, two inmates are partially blocking the view. *Id.* At 22:50, Deputy Carter stands back up. At 22:51, Defendant has Plaintiff on the floor on his stomach with his head towards the back wall of the pod. *Id.* At 22:52, Defendant is kneeling with his left elbow on Plaintiff's back. *Id.* Plaintiff appears to be lying still. *Id.* It is impossible to tell if Plaintiff is attempting to give Defendant his arm or not. *Id.* Defendant appears to rise up and strike the Plaintiff with his knee in the upper shoulder or neck area at approximately 22:53. *Id.* At 23:00, Defendant is holding Plaintiff still on the ground when a large number of the other inmates housed in the pod begin to gather around. *Id.* Deputy Carter turns his attention to getting the other inmates to back away. *Id.* When another deputy arrives, at approximately 23:24, Deputy Carter and the Defendant handcuff the Plaintiff. *Id.* At 24:35, Deputy Carter and Defendant assist the Plaintiff to his feet.

-7-

*Id.* When Deputy Carter starts to lead the Plaintiff towards the stairs, at approximately 25:00, Defendant walks by and Plaintiff approaches him. *Id.* In response, Deputy Carter takes the Plaintiff to the back wall. *Id.* At 26:00, Plaintiff exits the pod. *Id.*

In the incident report written by Deputy Carter, he states:

> Ci[]fuentes was on top of him and telling him to get on the ground. Schwenke was resisting at first but tried to comply. He kept yelling for Cifuentes to stop and could not comply with the command because he was being sat on by Cif[]uentes. Cif[]uentes couldn't hear him yelling due to all the noise in the block. (In my personal opinion).

*Deft's Ex.* A-2 at 2.

When asked about these statements during his deposition, Deputy Carter testified that Plaintiff was listening to him but not to Defendant. *Plaintiff's Exhibit* C at 18.[3] Deputy Carter testified he had the Plaintiff's one arm but Plaintiff kept trying to push up on the side that Defendant was on. *Id.* Deputy Carter could not recall if Plaintiff's other arm was underneath him. *Id.* at 19.

Deputy Carter testified he could hear the Plaintiff because he was on the ground. *Plff's Ex.* C at 20. Deputy Carter testified he did not know if Defendant could hear the Plaintiff or knew Plaintiff was trying to comply with his orders. *Plff's Ex.* C at 20-23. Regardless of whether or not Defendant heard the Plaintiff, Deputy Carter testified that "Cifuentes did the right thing." *Id.* at 24. Deputy Carter testified that Plaintiff did not obey orders, put his hands on Defendant, disrupted the whole block, and put their lives in danger. *Id.* at 15-16.

In Defendant's incident report, there is no suggestion that Defendant was having difficulty hearing the Plaintiff. *Deft's Ex.* A-2 at 3-4. In fact, Defendant quotes several statements

---

[3]Page references are to the deposition page numbers.

allegedly made by the Plaintiff including the use of offensive language and telling Defendant he was not going to last long at the facility and was "f------ dead." *Id.* at 4. Defendant also states that when his knee "came down," Plaintiff's head hit the floor. *Deft's Ex.* A-2 at 4.

WCDC policy provides that only that amount of physical force necessary to maintain or regain control of a detainee shall be used by the staff. *Deft's Ex.* A at ¶ 6. Physical force may be used when an attack by a detainee on a facility employee . . . is actually occurring, is clearly imminent, or when other lesser means have failed to achieve a legitimate and necessary objective." *Id.*; *see also Deft's Ex.* A-7 at 1. The use of force policy section 40 sets forth parameters for the use of non-deadly force. It provides as follows:

- Where deadly force is not authorized, officers should assess the incident in order to determine which non-deadly technique or weapon will best de-escalate the incident and bring it under control in a safe manner.

- Law enforcement officers are authorized to use non-deadly force techniques and issued equipment for resolution of incidents, as follows:

    ○ To protect themselves or another from physical harm

    ○ To restrain or subdue a resistant individual

    ○ To bring an unlawful situation safely and effectively under control

*Deft's Ex.* A-7 at 2.

### 2. Applicable Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

AO72A
(Rev. 8/82)

"Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." National Bank of Commerce v. Dow Chemical Co., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." National Bank, 165 F.3d at 607 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." Id. (citing, Metge v. Baehler, 762 F.2d 621, 625 (8th Cir. 1985)).

### 3. Discussion

Defendant has moved for summary judgment on the following grounds: (1) the force used was reasonable under the circumstances; and (2) he is entitled to qualified immunity.

### (A). Use of Force

As noted above, Plaintiff was a pretrial detainee at the time of the incident. The law is clear that a pretrial detainee cannot be punished. See e.g. Bell v. Wolfish, 441 U.S. 520, 535 (1979). "However, not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense." Smith v. Copeland, 87 F.3d 265, 268 (8th Cir. 1996); see also May v. Sheahan, 226 F.3d 876, 884 (7th Cir. 2000) ("The Due Process Clause of the Fourteenth Amendment prohibits the use of bodily restraints in a manner that served to punish a pre-trial detainee").

The Supreme Court held that a pretrial detainee need only show that an officer's use of force was objectively unreasonable to prevail on an excessive force claim. Kingsley v. Hendrickson, et al, ___ U.S. ____, 135 S. Ct. 2466, 2473 (2015). The objective reasonableness of a use of force "turns on the 'facts and circumstances of each particular case.'" *Id.* (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)). The determination should be made:

> from the perspective of a reasonable officer on the scene. A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security."

*Id.* (quoting Bell v. Wolfish, 441 U.S. 520, 540 (1979)). In determining whether a given use of force was reasonable or excessive, the Court said the following may bear on the issue:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id*. The Court noted that the list was not exclusive but instead only illustrated the "types of objective circumstances potentially relevant to a determination of excessive force. *Id*.

Viewing the evidence in the light most favorable to the Plaintiff, I believe there is a genuine issue of material fact as to whether the amount of force used was objectively unreasonable. Although Plaintiff disobeyed orders given by Defendant and argued with him about whether or not certain items could be considered contraband, Plaintiff exhibited no overt sign of aggression prior to being yanked from his bunk. According to Plaintiff, he had not been ordered to stand, to submit to handcuffs, or to go to pod control. While Plaintiff does initially appear to be resisting being taken to the floor, at the time the Defendant forcefully dropped his

-11-

knee on Plaintiff's back/neck area, Plaintiff was, according to his testimony and that of Deputy Carter, yelling for the Defendant to stop and trying to comply with Defendant's orders. From the video, it does not appear that the Plaintiff is offering further resistance, represented a threat to the Defendant, or had to be further subdued. Cf. Hickey v. Reeder, 12 F.3d 754, 759 (8th Cir. 1993)(involving the use of a stun gun but stating "summary force has yet to be ratified as the *de jure* method of discipline where security concerns are not immediately implicated"). Additionally, Plaintiff, who was lying on the floor in a prone position, testified he could not physically comply with Defendant's orders because the Defendant was on top of him. Defendant's action caused the Plaintiff's forehead to impact the cement causing the injuries depicted.

Deputy Carter suggested that Defendant may not have been able to hear the Plaintiff due to the noise in the pod. *Deft's Ex.* A-2 at 2. Deputy Carter indicated he was able to hear the Plaintiff because he was on the ground with a hand on Plaintiff's shoulder. *Plff's Ex.* C at 20. However, the video indicates that Deputy Carter spent part of his time kneeling near the Plaintiff's lower body and was standing up much of the time that he was near Plaintiff's upper body. *Deft's Ex.* A-6. Defendant, who was physically on the ground with the Plaintiff throughout the incident, does not state he could not hear the Plaintiff. In fact, in his incident report, Defendant quotes various statements allegedly made by the Plaintiff as Defendant was attempting to subdue him. *Deft's Ex.* A-2 at 3-4. Further, in his deposition, Defendant disagreed with Deputy Carter's statements in his incident report that Plaintiff was yelling for Defendant to stop and that Plaintiff could not comply because Defendant was on top of him. *Plff's Ex.* A at 67-68. Defendant testified he never heard the Plaintiff yelling for him to stop or yelling that he

AO72A
(Rev. 8/82)

could not comply with the commands; but, Defendant testified he could hear Plaintiff cursing and refusing to comply. *Id.* at 68. Defendant is not entitled to summary judgment on the merits of the excessive force claim.

### (B). Qualified Immunity

"Qualified immunity protects state actors from civil liability when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Maness v. Dist. Court</u>, 495 F.3d 943, 944 (8th Cir. 2007). "The determination of whether a state actor is entitled to the protection of qualified immunity is a two-step process." <u>Washington v. Normandy Fire Protection Dist</u>., 272 F.3d 522, 526 (8th Cir. 2001). First, the court must ask whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right." <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001). Second, the court must determine whether that right is so clearly established that a reasonable official would have known that his actions were unlawful. <u>Pearson v. Callahan</u>, 555 U.S. 223, 232 (2009). "Qualified immunity is appropriate only if no reasonable fact-finder could answer yes to both of these questions." <u>Nelson v. Con. Med. Services</u>, 583 F.3d 522, 528 (8th Cir. 2009).

For the reasons discussed above, taken in the light most favorable to the Plaintiff, I believe the facts alleged will support a finding that the Defendant's use of force against the Plaintiff was objectively unreasonable in violation of the Due Process Clause. Similarly, I believe the law is clearly established that objectively unreasonable force may not be used against an inmate who is no longer resisting and attempting to comply with orders. See e.g., <u>Edwards v. Byrd</u>, 750 F.3d 728, 732 (8th Cir. 2014)(clearly established that force used against inmates

-13-

who were lying submissively, face-down would violate the Eighth Amendment); Thompson v. Zimmerman, 350 F.3d 734, 735 (8th Cir. 2003)(inmate no longer yelling or kicking the doors-- no basis for a reasonable officer to believe force was needed at the time to prevent detainee from endangering himself or others); Peters v. Woodbury County, Iowa, 979 F. Supp. 2d 901, 964 (N.D. Iowa 2013)(recognizing case law holding it was objectively reasonable to view it as permissible to force compliance with a legitimate order but concluding that existing case law "would not have led a reasonable jail officer to believe it was 'objectively reasonable' and permissible to bash an unresisting detainee's head against hard surfaces as the type and amount of force appropriate to compel compliance with the order"). Defendant is not entitled to qualified immunity.

### 4. Conclusion

For the reasons stated, I recommend that Defendant's motion for summary judgment (Doc. 18) be **DENIED** and the case scheduled for a jury trial.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 1st day of June 2017.

/s/ *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)